OPINION *Page 2 
{¶ 1} Plaintiffs-appellants Dominic and Linda Duco appeal the decision of the Jefferson County Common Pleas Court which granted summary judgment in this employer intentional tort action in favor of defendant-appellee Wheeling-Pittsburgh Steel Corporation. The issue on appeal is whether there is a genuine issue of material fact regarding whether the employer possessed the requisite intent to injure appellant. Specifically, we must determine whether reasonable minds could find that the employer had knowledge of a dangerous process or condition and whether the employer had knowledge that harm was a substantial certainty if appellant were subjected to such danger. For the following reasons, summary judgment is reversed and this case is remanded to the trial court as the existence of a dangerous process and the employer's knowledge regarding the level of an injury's certainty are questions to be answered by a jury.
 STATEMENT OF THE CASE {¶ 2} Appellant Dominic Duco has worked at Wheeling-Pitt in Steubenville, Ohio since 1964. He began assisting on the shipping floor in 1967 and has been full-time on the shipping floor since 1976, making permanent crew leader in 2002. (Duco 5-7). The relevant work on the shipping floor consisted of wrapping steel coils in paper to protect them from the elements. The coils are cylindrical in shape and weigh between 15,000 and 50,000 pounds. In the wrapping process, the coils are laid on their curved sides rather than on their ends.
 {¶ 3} On the morning of November 6, 2003, appellant's crew had just begun their shift. As usual, sheets of wrapping paper were cut and laid on the shipping floor, leaving only two to three feet of space between the coils once placed. The crane set the first coil down and let the hook slacken. Appellant then ensured the coil was stable in the typical manner by waiting five seconds, at which point the crane's hook was removed from the coil. (Duco 24).
 {¶ 4} The crane moved down the bridge to retrieve the next coil while the crew began wrapping the first coil by taping the paper in the middle and tucking the ends into the hole in the center of the coil. The second coil arrived and appellant performed *Page 3 
the same steps for stabilization. (Duco 26). After the coil was set, appellant turned around to put the identifying information on the wrapping of the first coil. (Duco 34). The second coil then began rolling at an uneven angle, crushing appellant against the first coil. Both coils weighed approximately 32,000 pounds. Appellant suffered a crushed pelvis and was off work for a year.
 {¶ 5} On September 30, 2005, appellant and his wife filed an employer intentional tort action against Wheeling-Pitt. The complaint stated that: the shipping room floor was in disrepair (with undulations, holes, broken concrete and uneven areas); nothing held the coils in place; the coils and floor are oily; and, prior coils have rolled. The complaint pointed out that appellant had to step between the coils to mark them after wrapping. The complaint also alleged that the employer had knowledge of these facts and then concluded that stepping between unblocked coils situated on an uneven floor created a dangerous condition from which harm was substantially certain to occur.
 {¶ 6} Discovery was conducted and multiple depositions were taken. Appellant disputed the employer's claim that he was hurrying. (Duco 36). He testified that he learned to wrap from the prior crew leader, that the method has not changed since he first started and that he did not deviate from that method. (Duco 8, 11-12, 16). He emphasized that his job entails walking or stepping between coils. (Duco 34-35). For instance, he explained that he must mark the coil after wrapping and tape the middle of the coil during wrapping, requiring action on both sides of the coil. (Duco 55-56).
 {¶ 7} Although appellant never witnessed an injury or near-injury due to a rolling coil, he has witnessed coils roll. (Duco 15-16, 27). He did not believe that the cause of the rolling coil in this case was the result of the crane operator's setting the coil on the lap (the final edge of the rolled steel) or the result of a rough crane operator setting a coil down "on the fly." (Duco 27-30). He insisted that he had ensured the coil's stability before turning his back to it. (Duco 56). When pressed as to why this particular coil rolled, he responded that he had "no idea" but then speculated that the vibration from a passing train engine that he heard right before the accident could have set the coil in motion. (Duco 39-40). He also voiced that movement after a coil is set was a concern because the floor was starting to get undulations. (Duco 37-38). *Page 4 
 {¶ 8} Appellant then revealed that he had been complaining about the deteriorated floor for years to his superintendent, the shipping foreman and various members of the safety committee at safety meetings. In fact, he resigned from his position on the committee when the management members ignored his complaints and implied that he should "shut up," do his job and let them worry about the condition of the shipping floor. (Duco 38). In the mid-nineties, he tore his knee when he stepped in a large hole in the floor, and in 2002, he tripped in a hole and injured his wrist while breaking his fall. (Duco 51-52).
 {¶ 9} Although management notes that the safety meeting minutes do not mention rolling coils and thus contends that appellant only complained that the floor was a tripping hazard, appellant testified that he hasvoiced his concerns about the condition of the floor outside of meetingsas well and has specifically expressed his concern about rolling coilscaused by the floor's flaws. (Duco 50). Appellant later reiterated thatfor nearly thirty years he has expressed his concern about coils rollingduring wrapping, specifically during the taping phase. (Duco 57).
 {¶ 10} When asked about blocking the coils, appellant stated that blocks were not provided because blocking is not part of the company's set routine. However, he would still sometimes use random items to brace a coil if it was already known to have rolled. He opined that they should have wedges available for blocking. (Duco 47-48).
 {¶ 11} Three crew members confirmed that they were not rushing on the morning of the accident. (Kinsey 10; Bates 14; Buffone 13). Mr. Kinsey, the crane operator since 1964, testified at deposition that appellant gave him the signal to set the coil down, paused to ensure it would not roll, gave him the signal to back out, and then turned to attend to the first coil. Ten to fifteen seconds later, when the crane was ten to fifteen feet out, Mr. Kinsey noticed the coil rolling toward appellant. He sounded the siren, but it was too late. (Kinsey 12, 16-18). He stated that coils occasionally roll, pointed to the uneven floor and speculated on the passing train. (Kinsey 18).
 {¶ 12} The remaining crew members did not witness the setting of the second coil or its actual rolling. Mr. Bates from appellant's crew testified that they have been wrapping the coils the same way for years and that he has worked there since 1964. (Bates 5, 13). He disclosed that they have had coils move after being set, but he *Page 5 
never saw one roll as far as this particular one did. (Bates 15-16). He opined that when coils roll, it is partially due to the uneven floor and may also result if the crane does not set it down properly. (Bates 15). He occasionally puts steel clips on the floor near the coil if he thinks it might roll. (Bates 21).
 {¶ 13} Mr. Buffone, an employee on appellant's crew who has worked at Wheeling-Pitt for nearly forty years with four years on the shipping floor, testified that he has witnessed coils roll before. (Buffone 18).He provided the uneven floor as one reason coils roll and specificallytestified that coils have previously rolled in the area of appellant'sinjury. (Buffone 19). This witness also testified that he has voicedcomplaints about the uneven floor due to the risk of coils rolling.
Finally, he noted that the employer has installed half of a new floor since the accident. (Buffone 22).
 {¶ 14} Mr. Jarvis, also from appellant's crew, responded that thefloor is uneven in that spot when asked why he thought the coil at issuerolled. He noted that he has seen coils roll even after sitting still for ninety seconds. (Jarvis 13-14).
 {¶ 15} The next three depositions provide the testimony of management. Mr. Rollo was appellant's immediate supervisor. He conducted an impromptu observation of appellant's work the day before the accident and found no problems with appellant's procedures. (Rollo 12-13). He was aware that the coils were often set a mere two feet apart. (Rollo 21, 24). Since the accident, a new written standard requires four feet of spacing. (Rollo 48).
 {¶ 16} Mr. Rollo also knew that it was a common practice to step between the coils to mark them, and he was aware that if the coils moved together, a pinch point would be created. (Rollo 21, 32). Regarding this pinch point, the pre-accident job safety analysis for the task of wrapping did not mention the pinch point between the coils, but this was amended after the accident. (Rollo 50). The job safety analysis also did not mention when to mark the coil, such as before a new coil is set on the floor.
 {¶ 17} When asked what can cause a coil to roll, Mr. Rollo pointedto a rough crane operator, the movement of the crane's hook out of the coil, the vibration of the crane moving along the runway or an unevenfloor combined with the weight of the coil. (Rollo 22-23, 32). At one point, he contradicted the employees' testimony by *Page 6 
opining that the floor in the specific area of the accident had been "pretty level," believing it was a different area that had the indentations and holes. (Rollo 27). Nevertheless, his official report on appellant's accident suggested the company should fix "dished" areas of the floor, and he later explained that he was concerned these areas could cause a coil to roll. (Rollo 35). He ended up conceding that anuneven floor may have been the reason the coil rolled at an unevenangle. (Rollo 43).
 {¶ 18} Mr. Rollo claimed that Mr. Bates and Mr. Buffone had advised him that they were rushing on the day of the accident due to a truck waiting in the bay. (Rollo 31). He did not know if the employees used blocks prior to the accident, but stated that it is not a normal company procedure. (Rollo 23, 41). He opined that removing the block in order to the put the paper around the coil made the block a "moot point" or increased the chance of rolling upon removal of the block. (Rollo 41). When asked why they cannot put the block under the paper so it would not need to be removed, he stated that this is difficult because the crane cannot see the blocks. When asked about permanent blocking which extendsbeyond the paper, he conceded that this could work. (Rollo 42).
 {¶ 19} The next deposition is that of Mr. Walker, who has been in management at Wheeling-Pitt since 1975 and began at this plant in 2001. He stated that when he visited appellant in the hospital, appellant said he had been rushing. (Walker 31). Mr. Walker also testified that in 2002, a safety bulletin was issued after an employee, who was marking a coil at a Pennsylvania plant, was crushed when the operator lowered a second coil which rolled into the first coil. (Walker 11). The employer believes this would not be considered a similar prior accident because the coils in that incident were not being wrapped and they were on a ramp, which would have caused the roll.
 {¶ 20} Mr. Walker acknowledged that coils roll in certain areas due touneven floors, undulations and holes. (Walker 21). He acknowledged that appellant complained at meetings about the uneven floor but did not know if the concern over rolling coils was the reason for the complaints. (Walker 25). He disclosed that they did not determine the cause of the roll in this case and they took no measurements or pictures of the floor under the coils. (Walker 28, 31). He also admitted that he had *Page 7 knowledge of coils rolling into other coils and rolling into parts ofthe building and causing damage. (Walker 34-35).
 {¶ 21} Mr. Walker agreed that blocking would prevent rolling and noted that they use blocking when coils are in storage. (Walker 22). However, they have not come up with a system for blocking during the wrapping process. After the accident, they tried v-shaped mats, but he found that they created a hazard in trying to set the coil on the mat and created a tripping hazard. They also tried wood but he said it was hard to get the block under the paper properly and believed it was more hazardous. He stated that they did not seek advice from an outside consultant regarding a blocking solution. (Walker 22-23).
 {¶ 22} The next deposition is that of Mr. Ensell, the manager of corporate safety. He agreed that due to the shape of the coil and anuneven floor, coils can roll. (Ensell 23, 49). He stated that coils can also move as a result of expansion and contraction. (Ensell 41). Mr. Ensell was not aware that appellant had complained about the condition of the floor; however, he was aware of holes in the shipping floor. (Ensell 23, 26). He admitted that in viewing the scene right after the accident, he should have inspected the floor under the coils or under the sheets of wrapping paper left spread over the floor. (Ensell 40, 51). As to blocking, Mr. Ensell explained that if they put the blocks on the paper, they would be wrapped inside, and he worried that if putting blocks under the paper might rip the paper. (Ensell 52). It was pointed out that he has never performed the task of wrapping coils. (Ensell 22).
 {¶ 23} Although other managers admitted the crew often stepped between coils, Mr. Ensell stated that he was unaware that the crew did so or that they had been instructed to do so. He stated that the employees should never step between two coils and that appellant's supervisors should have told him not to wrap in this manner due to the potential pinch point. Specifically, he opined that appellant should have waited for the wrapping of the first coil to be completed so he could mark it before setting the second coil. (Ensell 57-58). However, no safety policy provided such a procedure before or after the accident.
 {¶ 24} Appellant also provided the deposition of an expert. Thisexpert stated that the control of rolling steel coils is an industrystandard. He made deductions *Page 8 
about the floor being the cause and acknowledged other possible causes. He also opined that injury was a substantial certainty.
 {¶ 25} The employer countered with the affidavit of a statistician, who calculated that one accident in the almost forty years appellant worked at Wheeling-Pitt, with approximately 100,000 coils wrapped in that time frame, constituted "virtually no likelihood" of an injury.
 {¶ 26} On December 28, 2006 after the completion of discovery, the employer filed a motion for summary judgment. They pointed to the inherent potential of a coil to roll and noted that they cautioned theemployees to ensure the coils were secure before going between them(thus contradicting Mr. Ensell's claim that the employees should neverstep between coils). They urged there was no dangerous condition above that normally encountered in this job. The employer also argued that appellant's injury was not substantially certain to occur, pointing out the lack of prior accidents as an important (but not dispositive) factor. They claimed that any complaints about the floor only related to its potholes constituting tripping hazards rather than rolling hazards.
 {¶ 27} Appellant filed a brief in opposition to summary judgment, opining that the rolling of the coil that injured him was most likely due to the uneven floor and the lack of blocking. He urged that the reason he does not know for sure is because the employer failed to properly investigate (as they did not take pictures of the floor or even view the floor under the coils and paper). Appellant noted the admission that the employer required or at least encouraged him to step between the coils and into a known pinch point. He emphasized that the employer knew coils rolled but failed to correct the known rolling hazard or institute sufficient safety procedures, pointing to testimony that he did secure the second coil before stepping between the coils just as instructed to do so. He then pointed to deposition testimony on prior complaints about the floor's condition related to rolling coils in addition to tripping hazards.
 {¶ 28} An oral hearing was held on July 16, 2007. On July 19, 2007, appellant sought leave to file a rebuttal affidavit. Apparently, appellant just discovered the existence of a prior accident at this very plant where an employee was pinned by a coil *Page 9 
against a beam. The employer objected to this supplementation. The court's August 15, 2007 judgment entry impliedly denied appellant's supplementation request.
 {¶ 29} In this entry, the trial court granted the employer's request for summary judgment. The court found that appellant produced no facts to support the contention that the floor contributed to the coil rolling or that the injury was substantially certain to occur. The court noted that the task was performed thousands of times without incident or close call. The court set forth the three parts of the employer intentional tort test pronounced in Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115.
 {¶ 30} As to the first part, the trial court stated that the mere fact that the employer's process involves the existence of danger does not automatically classify the acts or omissions as an intentional tort because the danger must fall outside of the natural hazards of employment which one assumes have been considered by the employer when promulgating safety procedures. The trial court reasoned that coils are cylindrical and thus have a potential to roll. The court found that the procedure in place was to caution the need to ensure the coil was secure before starting to wrap, noting that appellant did in fact follow this procedure of ensuring the newest coil was steady before returning to the first coil.
 {¶ 31} As to the second prong, the trial court stated that substantial certainty is determined on a case by case basis and requires more than the employer's knowledge that a condition presented a high risk of harm. The court then found the lack of prior accidents in thirty-nine years was a strong indicator that the employer did not know the injury was substantially certain to occur especially since the employer had warned employees to watch for pinch points and to ensure coils are stable before working around them. The court made no conclusion as to the third prong of the Fyffe test as the employer did not dispute that there was a genuine issue of fact as to whether they required appellant to place himself in the relevant position.
 GENERAL LAW {¶ 32} A defendant can successfully seek summary judgment if the evidentiary documents show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Civ. R. 56(B), (C). Summary *Page 10 
judgment cannot be rendered unless reasonable minds can only come to a conclusion adverse to the nonmovant. Civ. R. 56(C).
 {¶ 33} When a motion for summary judgment is made and supported, the nonmovant may not rest upon the mere allegations or denials of that party's pleadings; rather, in order to avoid summary judgment, the nonmovant's response must set forth specific facts showing that there is a genuine issue for trial. Civ. R. 56(E). In reviewing the opposing filings and evidence, the court must construe the evidence in the light most favorable to the nonmovant. Civ. R. 56(C). Even the inferences to be drawn from the facts contained in the evidentiary materials must be construed in the light most favorable to the nonmovant. Turner v.Turner (1993), 67 Ohio St.3d 337, 341.
 {¶ 34} In an employer intentional tort action, an employee faced with an employer's motion for summary judgment must set forth specific facts to raise a genuine issue on whether the employer's intent meets all three prongs of the Fyffe test. Hannah v. Dayton Power Light Co.
(1998), 82 Ohio St.3d 482, 485. The proof cited by the employee can be either direct or circumstantial evidence. Id. In order for the employee to establish intent, said employee must demonstrate each of the following:
 {¶ 35} "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;
 {¶ 36} "(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and
 {¶ 37} "(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, syllabus ¶ 1.
 {¶ 38} The Fyffe syllabus goes on to say:
 {¶ 39} "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As *Page 11 
the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id. at syllabus ¶ 2.
 {¶ 40} The Fyffe Court then specifically pointed out that someindustrial activities that involve a high or great risk of harm mayreasonably fall under the scope of an employer intentional tort. Id. at 117. The Court has since reiterated that the standard for establishing an employer intentional tort becomes known not so much from the language of the test as it does from the court cases rendered in response to specific fact patterns. Gibson v. Drainage Prods., Inc.,95 Ohio St.3d 171, 2002-Ohio-2008, ¶ 27. Consequently, these types of cases must be evaluated based upon the totality of the circumstances regarding each accident. Id. Since the Supreme Court has instructed us to view the facts of each case to determine the proper scope of this common law tort, we shall review the facts involved in Fyffe and some of the post-Fyffe Supreme Court cases.
 {¶ 41} The Fyffe Court found a genuine issue of material fact where the employee stated that he had been trained to clean a running machine made by the employer which had a safety guard but which safety guard had been removed, with knowledge of the employer, for easier cleaning. Id. at 119-120. Among other factors, the Court considered the routine procedures of the job and the post-accident report which reported a hazardous method as the reason for the injury. Id. at 120.
 {¶ 42} The aforementioned Gibson Court, faced with a summary judgment on only the third element of Fyffe, found that the issue as to whether the employer required the employee to engage in a dangerous task was for a jury where molten plastic was discharged from a manufacturing line and burned the employee. Gibson, 95 Ohio St.3d 171 at ¶ 29 (reversing summary judgment on the third Fyffe element and remanding to appellate court on remaining elements). Id. On remand, the Gibson appellate court found a genuine issue of material fact as to whether the method of repairing the system caused a dangerous condition and whether injury was *Page 12 
substantially certain to occur if someone was standing at the site ofthe eventual discharge. Gibson, 3d Dist. No. 11-99-14, 2002-Ohio-6258. The Third District noted that the substantial certainty test does not establish a "one free bite" rule and the notice to the employer need not take the form of a prior workplace incident. Id. at ¶ 17, discretionary appeal declined, 98 Ohio St.3d 1492, 2003-Ohio-1189.
 {¶ 43} The factual background of three other Supreme Court cases, where the Court summarily reversed in favor of the employee in one sentence entries, is also enlightening. In one case, a backup alarm on a roadside machine was disconnected, most likely the result of a mechanic forgetting to reconnect it during a repair nineteen days before the employee was run over. The appellate court in discussing the second prong of Fyffe found that there were no prior accidents and the employer had no knowledge of the dangerous condition. Miller v. Ruhlin Constr,Inc. (Apr. 4, 2001), 9th Dist. No. 20149. The appellate court noted that mere knowledge and appreciation of the risk was not intent and concluded that there was only evidence of negligence or recklessness but not evidence that injury was substantially certain. Id. Although the trial court and the appellate court both cited Fyffe, they apparently applied it incorrectly to the facts of the case because the Supreme Court reversed the summary judgment on the authority of Fyffe without further opinion. Miller, 95 Ohio St. 3d 532, 2002-Ohio-2830. Thus, the Court viewed the aforementioned facts as sufficient to withstand summary judgment.
 {¶ 44} In another case, the employee was using a table saw without a safety guard with the employer's alleged knowledge. The employer said the guards were available in the cabinet near the saw, but the employee said that he did not know this. The appellate court found that he had made a thousand cuts without a guard and never asked anyone about the lack of guards. The appellate court concluded that the employer lacked the requisite intent. Duckworth v. Creative Interglobal, Inc. (May 5, 1994), 8th Dist. No. 65449. The Supreme Court reversed and remanded to the trial court for further proceedings without further opinion, thus finding these facts worthy of a jury trial. See Duckworth (1995),74 Ohio St.3d 12.
 {¶ 45} In the last case, the appellate court applied Fyffe and found that the harm to an employee's nervous system from a chemical cleaner was not a substantial *Page 13 
certainty where there were no prior reports of problems, the employer provided protective clothing and equipment as advised in the cleaner's safety book and the exposure level was low. Gibbs v. Simcote, Inc. (Oct. 6, 1993), 3d Dist. No. 9-93-15. The Supreme Court, however, reversed the grant of summary judgment and remanded the case to the trial court on the authority of Fyffe without further opinion. Gibbs, (1995),71 Ohio St.3d 651. Thus, the lack of prior injuries and the provision of the type of safety gear recommended by the manufacturer was found by the Supreme Court to be insufficient to grant summary judgment to an employer on an employee's intentional tort claim.
 {¶ 46} The employer believes our court has a recent trend of upholding summary judgments granted in favor of the employer in intentional tort cases. See, e.g., Wallace v. Shelly Sands, Inc., 7th Dist. No. 04BE11,2005-Ohio-1345, ¶ 23 (finding no dangerous condition where employee fell during surge in water pressure even though it was alleged that safety handle should have been but was not over water tank on which employee had to stand). However, we do not acknowledge the existence of such a trend and note our commitment to review on a case by case basis and the resulting dependency of the specific facts of each case. Moreover, there are various cases where we have found genuine issues of material fact in these workplace actions.
 {¶ 47} For instance, there is the case of the hectic employee who dropped her pen onto the conveyor belt of a machine, reached into the machine, whose guard had been removed, and was injured. The employer pointed to a lack of prior accidents and an inability to anticipate that an employee would blindly stick their hand into a running machine to retrieve a pen. This court stated that the lack of prior accidents is not dispositive, pointing out that merely because people are not always injured when they encounter a danger does not mean that an injury is not substantially certain to occur. Jackson v. Astro Shapes, Inc. (Feb. 29, 2000), 7th Dist. No. 98CA179. We also considered the removal of the safety guard done to facilitate maintenance of which the supervisors had knowledge and refused to hold the employee's alleged negligence against her for purposes of an employer intentional tort summary judgment. Id. We then reversed the trial court's grant of summary judgment, allowing the case to be *Page 14 
resolved by a jury. Id. See, also, Abbott v. Jarrett Reclamation Serv.,Inc. (1999), 132 Ohio App.3d 729, 745 (7th Dist.) (genuine issue of fact on whether cave in of five foot trench was substantially certain to injure employee where no safety equipment or means of egress provided);Murray v. East Ohio Gas (1996), 111 Ohio App.3d 57 (7th Dist.) (reversing summary judgment and finding genuine issue of material fact on chemical exposure and safety precautions).
 {¶ 48} Finally, we note a situation where an employee was injured when a large metal pipe rolled from a pile and crushed his leg. That employee had previously complained that they had inadequate time to break down the precarious piles to make them more stable. The appellate court found a genuine issue of material fact as to the employer's knowledge of the dangers associated with the stacked pipes. Talik v. Federal Marine Term.Inc., 8th Dist. No. 87073, 2006-Ohio-3979, discretionary appeal not accepted on this holding but case reversed on ground that employee was covered by federal act which precluded intentional tort actions,2008-Ohio-937. Upon setting forth these general premises, we now turn to the specific issues raised herein.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 49} Appellant's first assignment of error contends:
 {¶ 50} "THE TRIAL COURT ERRED IN FAILING TO VIEW THE FACTS IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF, THE NON-MOVING PARTY, AS REQUIRED BY THE SUMMARY JUDGMENT STANDARD."
 {¶ 51} Here, appellant lists various findings in the trial court's judgment entry as evidence that the trial court viewed the evidence in the light most favorable to the employer instead of in the light most favorable to his position. Since we review the grant of summary judgment de novo, we need not comb the court's entry for factual or legal misstatements or evaluate the trial court's construction of the evidence. See Bonacorsi v. Wheeling Lake Erie Ry. Co.,95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. As such, we need not review each of appellant's complaints here. Rather, we shall conduct a thorough de novo review, which may encompass some of the same topics addressed herein, within the pertinent assignments of error below.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 52} Appellant's second assignment of error provides: *Page 15 
 {¶ 53} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT WHERE THERE REMAINED GENUINE ISSUES OF MATERIAL FACT UPON WHICH A REASONABLE JURY COULD CONCLUDE THAT DEFENDANT-APPELLEE KNEW OF A DANGEROUS PROCESS, PROCEDURE, INSTRUMENTALITY, OR CONDITION WITHIN ITS BUSINESS OPERATION."
 {¶ 54} Appellant argues here that the employer knew the floor was in disrepair, knew an uneven and indented floor could set off a roll, knew of the pinch point hazard between the coils, knew that being crushed between 30,000 pound coils would cause injury, knew the employees had to step between the coils to do their job, and knew there was no safety procedure such as blocking to prevent rolling. Appellant points out his repeated complaints about the condition of the floor during and outside of safety meetings. He notes that the safety manager said it was wrong to put oneself between the coils and points out that the company's published procedure did and still does allow and even require such action. He concludes that an unblocked coil on an unsafe floor where coils are known to roll combined with inadequate safety protocol regarding spacing, timing and placement of the body caused a dangerous condition about which the employer knew.
 {¶ 55} The employer urges that the dangerous process or condition prong of the test is not met merely because a particular industrial job is dangerous. They urge that the cylindrical coils with a potential to roll must be handled and worked near in order to wrap them and that their safety procedure of instructing the employee to wait until the coil is stable before wrapping it and their caution on pinch points was sufficient to make the inherent danger in the job fall outside of the realm of the dangerous process or condition element.
 {¶ 56} This assignment of error coincides with the first element of the Fyffe test: "knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation * * *." Fyffe, 59 Ohio St.3d at syllabus ¶ 1. As appellee points out, we have previously cited appellate law for the proposition that a dangerous condition does not exist unless the danger falls outside the natural hazards of the employment. English v. GeneralElec. Co., 7th Dist. *Page 16 
No. 03MA140, 20024-Ohio-6212, ¶ 22-23 (distinguishing generally dangerous work from a dangerous condition within that work). However, we still found a genuine issue of material fact as to the first Fyffe element where the employee used a flammable chemical to clean a coiling machine and where the chemical's container warned not to spray near ignition sources. English, 7th Dist. No. 03MA140 at ¶ 26-27. Although we then found against the employee (on the grounds that the dangerous condition was taken into consideration by the employer when promulgating proper safety regulations and procedures which lessened the chance of an accident to less than a substantial certainty), such holding was based upon the second prong of Fyffe. See id. at ¶ 37-39.
 {¶ 57} The "falling outside the natural hazards of employment" statement does not mean that an employer can avoid the firstFyffe element by the mere fact that the work to be performed is inherently dangerous. In other words, operating what can be considered a dangerous machine may be necessary to a particular job, but operating that dangerous machine without proper safety mechanisms or protocol may not be necessary to such job and would fall outside the natural hazards of the employment. See Fyffe, 59 Ohio St.3d at 118-119.
 {¶ 58} Thus, wrapping coils could be considered a dangerous job, but this does not automatically mean that any injury that occurs during the wrapping process is exempt from employer intentional tort actions. Rather, the particular facts of the case must be studied to determine whether some rational person could find that the danger was reasonably subject to mitigation and that the employee's task was made dangerous by the lack of reasonable safety measures. There is no great distinction between the cases involving the removal of previously installed safety guards and a case such as this where there exists the failure to ever install an allegedly available safety guard combined with a failure to repair an uneven floor in the face of weighty and unstable coils that are known to spontaneously roll.
 {¶ 59} The coils are heavy and cylindrical. The employer admits that it knew that coils could roll and admits that it knew that coils have rolled in a manner so as to damage property. The coils are known to roll for various reasons including: vibrations from passing trains or the nearby tracks or the overhead crane backing away during wrapping; being set on the lap; floor problems; general failure to settle within five *Page 17 
seconds and regular expansion and contraction. However, there is nothing to stop these cylinders from rolling into an employee, a condition which appellant's expert stated violated the industry standards.
 {¶ 60} Blocking was not encouraged (and was seemingly even discouraged), and no blocks were provided for employees to use. Rather, these employees would scrounge for random objects to use as blocks when they felt particularly vulnerable to a roll. This is distinguishable from the case cited by Wheeling-Pitt, where the employer did not know that employees were only using two nails to hold scaffolding wall picks instead of the four nails supplied and where safety harnesses were provided but not used. See Hubert v. Al Hissom Roofing Constr.,Inc., 7th Dist. No. 05CO21, 2006-Ohio-751. Here, there was no safety device provided but discarded.
 {¶ 61} Due to the admittedly spontaneous nature of certain rolls, there is also a genuine issue as to whether the safety procedures taught to appellant and upheld by his supervisor were enough to take the coil from being a dangerous condition to a natural hazard of employment. For instance, appellant placed the coils a mere two feet apart, and management had no issue with this regular procedure until after the accident. Additionally, appellant was taught to wait a mere five seconds before continuing with wrapping, and he stated that he was never instructed to stop stepping between the coils to complete the wrapping.
 {¶ 62} The employer's own corporate safety manager testified that the coils are a dangerous condition if you step between them. By further opining that the employees should never step between coils, he essentially conceded that the customary procedure of regularly stepping between coils during the wrapping process was outside of the natural hazards of this employment situation. Yet, no safety procedure prohibited such movement, appellant was taught to engage in such movement, and members of management watched appellant performing such movement over the years; or, at least, there is a genuine issue of material fact regarding these statements. Even after the accident, the new and revised procedure still permits and impliedly encourages stepping between coils (by stating that employees should wait until the coil settles before doing so). *Page 18 
 {¶ 63} Moreover, the floor admittedly had major problems. Although one member of management opined that the area of the accident was not the problem section of the floor, other testimony disputed this and specifically provided otherwise. Testimony also disputed management's claim that appellant's complaints only related to a tripping hazard. Both appellant and another employee said that they also voiced concern with the rolling hazard caused by the disrepair of the floor that got worse over the years. In any event, a rational juror could conclude that even general complaints about an uneven and potholed floor should put management on notice that such condition could contribute to a coil rolling.
 {¶ 64} We cannot say that the failure to use blocks combined with the failure to repair the floor and the alleged failure to have certain safety procedures in place regarding timing, spacing and body placement are insufficient as a matter of law to constitute a dangerous condition under the first prong of the Fyffe test. Rather, the spontaneous rolling of 30,000 pound steel coils around an uneven and battered shipping floor where the coils are set a mere two feet apart and where employees are taught to step between unblocked coils after only counting to five seconds can reasonably be considered a condition beyond the natural hazards of this employment situation. Viewing all of the evidence here and the reasonable inferences that can be drawn therefrom, there is a genuine issue of material fact on whether the employer had knowledge of a dangerous process or condition. This assignment of error is sustained.
 {¶ 65} We note here that many of the concepts concerning knowledge are further developed infra concerning the second prong of theFyffe test, which deals with knowledge of a substantially certain harm and relies on many of the same facts of the element of knowledge of the dangerous condition. Because of the intertwining facts regarding knowledge, we shall also refer to the relevant portions of the discussion below to support the knowledge of the employer here.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 66} Appellant's third assignment of error provides:
 {¶ 67} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT WHERE THERE REMAINED *Page 19 
GENUINE ISSUES OF MATERIAL FACT UPON WHICH A REASONABLE JURY COULD CONCLUDE THAT DEFENDANT-APPELLEE KNEW THAT IF A EMPLOYEE WAS SUBJECTED TO THE PROCESS, PROCEDURE, INSTRUMENTALITY, OR CONDITION, THAT INJURY WAS SUBSTANTIALLY CERTAIN."
 {¶ 68} This assignment of error coincides with the second element of the Fyffe test: "knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty * * *." Fyffe, 59 Ohio St.3d at syllabus ¶ 1. Appellant urges that the lack of prior accidents is not dispositive of substantial certainty but is merely one factor to consider. On this subject, he quotes a case noting that employer intentional tort law does not give "one free injury" to the employer. See Cook v. Cleveland Elec.Illum. Co. (1995), 102 Ohio App.3d 417, 429-430. Appellant also states that his expert's deposition testimony can be considered on the issue of substantial certainty. He concludes, as did his expert, that the longer an employee is exposed to a dangerous condition, the more likely it is that an accident will occur.
 {¶ 69} The employer counters by stating that the lack of prior accidents, although not dispositive, is a strong indicator that the injury was not substantially certain to occur, citing English, 7th Dist. No. 03MA140 at ¶ 38. They also point out that many of the cases cited by appellant regarding prior accidents were situations that existed for only a short time, whereas here, the same situation existed for over three decades. The employer then points out that a court is not bound by an expert's legal conclusions and notes that their expert is a statistician while appellant's expert had statistical training.
 {¶ 70} We must first point out that the Fyffe Court modified the syllabus law of its VanFossen case by deleting the words "and not just ahigh risk" which were previously included immediately after "substantial certainty" in the second prong of the test. See Fyffe, 59 Ohio St.3d 115
compared to VanFossen v. Babcock Wilson Co. (1988), 36 Ohio St.3d 100, syllabus ¶ 5. The Fyffe Court clarified that although acts by the employer that create a "high risk of harm" or "where the risk is great" could in most instances be viewed as acts of recklessness, "in a given instance, and within a certain fact pattern, such acts could equate to one that is substantially certain to result in harm *Page 20 
to the employee, and reasonably raise a justiciable issue of an intentional tort." Id. at 117. The Fyffe Court also noted:
 {¶ 71} "in situations where there was `just a high risk' of harm to the employee or `where the risk is great,' there may have been uncertainty as to what culpable mental state the employer possessed. It is argued that some industrial activities that involve a high risk of harm, or where the risk of harm is great, may reasonably encompass situations that fall within the scope of an `intentional tort.' We conclude that this is a reasonable argument." Id.
 {¶ 72} Thus, in certain factual scenarios, the Supreme Court recognizes that just a high risk of harm can meet the substantial certainty test even in industrial settings that may be inherently dangerous. As mentioned in the general law section above, the ascertaining of the law on this subject is more a question of comparing the facts of the prior Supreme Court cases to the facts at hand than a focus on the words used in the elements of the Fyffe test. Gibson v.Drainage Prods., Inc., 95 Ohio St.3d 171, 2002-Ohio-2008, ¶ 27. Thus, we shall thoroughly canvass the facts of the case before us.
 {¶ 73} First, although the trial court need not concur in the legal conclusion reached on a particular set of facts, appellant's expert's report was relevant. See Crnarich v. United Foundaries, 7th Dist. No. 02CA128, 2003-Ohio-4458, ¶ 23, citing Burgos v. Areway, Inc. (1996),114 Ohio App.3d 380, 384. This expert, besides opining on legal conclusions and potential causes, also advised that the employer violated the industry standard by failing to identify, evaluate and control the hazard of rolling coils and failed to implement any safety program. (Gallagher 86-87).
 {¶ 74} In any event, we have more than just an expert opinion to support the opposition to summary judgment here. For instance, a lack of safety procedures tends to increase the certainty of the injury. SeeEnglish, 7th Dist. No. 03MA140 (where we found that the dangerous condition was taken into consideration by employer in promulgating safety regulations and procedures which should have lessened the chance of an accident to less than a substantial certainty). Thus, we also evaluate the effectiveness of any safety procedures and the lack thereof. *Page 21 
 {¶ 75} The employer knew that coils roll for various reasons during the wrapping process. The employer knew that if one coil rolled into another coil, a pinch point would be created, which would cause injury to an employee if caught between the two coils. As appellant points out, the prior job safety analysis did not set a standard for spacing the coils to be wrapped. Management knew the employees were setting these unpredictable coils two to three feet apart as they had apparently been trained; it was not until after the accident that management ordered spacing at four feet apart.
 {¶ 76} Management also knew the floor was in disrepair. Five employees testified that undulations and unevenness are often the cause of a rolling coil. Management conceded that such condition can cause a coil to roll. The fact that appellant's supervisor, Mr. Rollo, opined that the floor in the area of the accident was "pretty level" or that the indentations were in a different area of the shipping floor does not mean that it was in fact so, especially since his report filed immediately after the accident recommended action regarding the "dished" areas of the floor as a remedial measure. As Mr. Ensell conceded, he could have taken pictures of the floor or used a level to determine the degree of unevenness. He did not even view the floor under the coils and wrapping paper at the scene of the incident. Due to the installation of a new floor since the accident, appellant cannot produce physical evidence of the floor's condition at the accident site.
 {¶ 77} Contrary to the trial court's suggestion, the fact that it cannot be ascertained exactly what caused this coil to roll does not destroy appellant's case. A jury can reasonably infer a combination of causes, all of which were anticipated by the employer. Vibrations from passing trains and the moving overhead crane are anticipated at this plant. Since it is known that coils can roll and that the floor has defects, the existence of such vibrations tend to require more safety precautions to ensure a coil does not suddenly roll into an employee, especially where the coils are set close and where employees are allegedly required to walk between them. The employer also knew that coils roll due to mere expansion and contraction. This fact does not provide the support for the employer's case that they claim. Rather, the existence of this fact makes safety measures even more necessary. *Page 22 
 {¶ 78} This leads to the issue of the lack of a blocking procedure. That is, the importance of why the coil rolled is even further diminished by the fact that had blocking been instituted, the coil would not have rolled for any of the reasons suspected in this case. (Even further, one could find that the injury would not have occurred but for the lack of blocking.) Essentially, the employer discourages its employees from using blocks during and after the wrapping process because management believes it is cumbersome and some techniques seem more hazardous to them than not blocking at all. However, the employer's opinion on this matter is not dispositive of the issue of whether the lack of blocking tends toward appellant's position in the summary judgment stage of the case. That is, merely because the employer says that blocking is not reasonable does not make it so, and this court is not in the position to declare as a matter of law that blocking is not required.
 {¶ 79} We further note that appellant was taught to count five seconds before trusting a coil to be secure. His immediate supervisor has no problem with this procedure, and the deposition testimony of the next level supervisor expressed satisfaction with appellant's technique. (Rollo 12-14); (Walker 23-24). Yet, a crew member testified that he has seen a coil roll after ninety seconds. Considering this fact along with the vibration and the floor issues, an employee waiting five seconds for the coil to settle can be considered to be an inadequate safety measure. As to management's contention that the crew admitted it was rushing, which they imply caused him to fail to wait for the coil to settle, this fact and the accompanying implication are in dispute.
 {¶ 80} In addition, the lack of prior injuries to humans is not as strong a factor here as the employer believes, at least not for summary judgment purposes. Although there were no established prior injuries to humans at this plant due to the spontaneous rolling of coils,[1]there were known prior rollings in general and there were known priorrollings that caused physical property damage.
 {¶ 81} Moreover, a lack of prior accidents is not dispositive.Jackson v. Astro Shapes, Inc. (Feb. 29, 2000), 7th Dist. No. 98CA179 (pointing out that merely because *Page 23 
people are not always injured when they encounter a danger does not mean that an injury is not substantially certain to occur). There is no "one free injury" rule allowing an employer to receive summary judgment on the second Fyffe element by showing no prior personal injuries. See, e.g., Gibson v. Drainage Prods., Inc., 3d Dist. No. 11-99-14, 2002-Ohio-6258, ¶ 17; Cook v. Cleveland Elec. Illum. Co. (1995),102 Ohio App.3d 417, 429-430.
 {¶ 82} Thus, just because a fellow employee was never crushed or almost crushed by the familiar sight of spontaneously rolling unblocked coils does not mean that an injury is not substantially certain to occur where the employees are regularly required (for purposes of summary judgment) to walk between the coils on an arguably uneven and wavy floor in a spot where crane and train vibrations are anticipated. As appellant urges, a rational person could characterize the work environment as an accident waiting to happen.
 {¶ 83} Appellant also notes that the published job safety analysis warned only of pinch points between a coil and a tractor or crane (both of which are objects intended to be moved), but did not warn about a pinch point between two coils until after the accident. (Walker 20). The employer resorts to a brief 2002 "safety bulletin", which described a Pennsylvania plant accident and warned employees to be alert and stay out of pinch points. They wish to use this bulletin to show that employees were instructed to refrain from stepping between coils; yet they simultaneously state that it cannot be used as evidence of a prior accident for purposes of substantial certainty because the accidents were not similar. This is disingenuous. If it is not relevant to the injury here, then how could it properly warn appellant about the dangers of his job and cause him to change his protocol. Regardless, appellant claimed that he never received this "bulletin." In fact, Mr. Rollo, appellant's supervisor, never saw the bulletin either.
 {¶ 84} Finally, we find great support for the second Fyffe element in the corporate safety manager's deposition testimony. He believed that it was improper to ever step between coils during the wrapping process. He explained that they should finish one coil before placing the next one and they should always stay on the open side of the last coil. However, appellant states that he was not trained in this manner, *Page 24 
and the job safety analysis describing the task of wrapping did not specify this procedure or mention when to mark a wrapped coil. Furthermore, although the safety manager made the aforementioned broad statements that employees should never step between the coils during wrapping, the post-accident amended job safety analysis still does not prohibit this behavior. Rather, it now states, "[p]rior to moving between coils to mark, make sure coils are stable and be aware of all moving objects in the area." Thus, contrary to the claimed effect of a warning about a Pennsylvania accident and contrary to the safety manager's own opinion, movement between coils is actually encouraged in order to mark the coil, the very task appellant was performing herein.
 {¶ 85} The corporate safety manager's testimony tends to show that the employer knew that injury was substantially certain to occur if employees work or step between the coils. Appellant testified that stepping between the coils was a required part of his job. At least one member of management admitted that he knew that the employees regularly stepped between the coils to perform their job and did not seem to find this to be a safety issue. (Rollo 32). In any case, whether appellant was in fact required to perform the dangerous task deals with the third prong of Fyffe which prong was conceded to be a question of fact for the jury. See assignment of error number four below.
 {¶ 86} Considering all of the foregoing facts, inferences and circumstances in the light most favorable to appellant, a reasonable person is not forced to come to a conclusion adverse to appellant. This assignment of error is sustained.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 87} Appellant's fourth and final assignment of error contends:
 {¶ 88} "THE TRIAL COURT ERRED IN GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT WHERE THERE REMAINED GENUINE ISSUES OF MATERIAL FACT UPON WHICH A REASONABLE JURY COULD CONCLUDE THAT DEFENDANT-APPELLEE, WITH SUCH KNOWLEDGE, DID ACT TO REQUIRE ITS EMPLOYEES TO PERFORM THE DANGEROUS TASK."
 {¶ 89} The employer responds to this assignment of error by conceding that there is a genuine issue of material fact on the remaining portions of the third prong of the Fyffe test. That is, they admit that, construing the evidence in the light most *Page 25 
favorable to appellant, a reasonable juror could find that appellant was required to perform the task in the manner that he so performed at the time of his injury. Because the parties agree that there exists a genuine issue of material fact on this matter, we need not delve further into this assignment of error.
 {¶ 90} For the foregoing reasons, we conclude that there exists a genuine issue of material fact on all of the Fyffe elements. As such, the trial court's grant of summary judgment is reversed, and this case is remanded for further proceedings.
Donofrio, J., concurs. Waite, J., concurs.
[1] Appellant did discover an employee injured by a rolling coil in the mid-1970's. However, the trial court refused to consider this employee's affidavit, apparently due to it being submitted after the time for filing summary judgment materials. *Page 1